IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-02027-PAB

AARON T. SHELEY,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,

    Defendant.

---

**ORDER**

---

This matter comes before the Court on plaintiff Aaron T. Sheley's complaint [Docket No. 3], filed on September 19, 2008. Plaintiff, through counsel, seeks review of the final decision of defendant Michael J. Astrue (the "Commissioner") denying plaintiff's claim for disability insurance benefits under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c. The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).[1]

**I. BACKGROUND**

On January 24, 2006, Mr. Sheley applied for disability benefits, alleging he was unable to work beginning January 6, 2006. After his claim was initially denied, an administrative law judge ("ALJ") held a video hearing on January 16, 2008. R. at 12. In a decision dated April 1, 2008, the ALJ found that the "claimant has the following

---

[1] Neither party requested oral argument. *See* Joint Case Management Plan [Docket No. 11] ¶ 9.

severe impairments: schizophrenia, an affective disorder, osteopenia of the left hip, and a history of polysubstance abuse." R. at 14 (citing 20 C.F.R. § 404.1520(c) and 416.920(c)). The ALJ concluded that these severe impairments did not, alone or in combination, meet or equal one of the listed impairments in the regulations. R. at 14-15. The ALJ proceeded to find that Mr. Sheley retained the "residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) and that he should also be limited to work with a SVP ["Specific Vocational Preparation"] level of 3 or less, GED ["General Educational Development"] levels between 1-3, and limited contact with the general public."[2] R. at 15. The ALJ concluded that Mr. Sheley "is able to perform past relevant work as a flagger which is light, unskilled work and would also not involve more than occasionally dealing with the general public." R. at

---

[2] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."); 20 C.F.R. § 416.967(b) (same); *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) ("The Dictionary of Occupational Titles, which is published by the U.S. Department of Labor and relied on by the Commissioner for vocational information, assigns an SVP to each job it lists. SVP is defined as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.' An SVP level of 3 means that the lapsed time required to learn the job is '[o]ver 1 month up to and including 3 months.'") (citations omitted); *Malusa v. Astrue*, No. CV 07-655-TUC-CKJ (CRP), 2009 WL 2707219, at *4-5 (D. Ariz. 2009) ("The GED levels 'embrace[] those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective.'") (citing *Dictionary of Occupational Titles*, App. C. § III.).

18. Nevertheless, the ALJ proceeded to the final step of the evaluation process, concluding that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. at 19. Based on those findings, the ALJ ruled that Mr. Sheley was not disabled during the relevant period. On July 18, 2008, the Appeals Council declined review, making the ALJ decision the final decision of the Commissioner. R. at 4-6.

## II. ANALYSIS

### A. Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003). The district court may not reverse an ALJ simply because the Court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order

to determine if the substantiality test has been met." *Flaherty*, 515 F.3d at 1070. Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### B.  Evaluation of the ALJ's Decision

To qualify for disability benefits, a claimant must have a medically determinable physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from performing any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(1)-(2).

Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006). The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). The steps of the evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing his past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R. §

404.1520(b)-(f)).  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However, "[i]f the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience." *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987).  While the claimant has the initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

Mr. Sheley contends that "the ALJ found that Mr. Sheley's mental limitations were such that they could reach the level of severity of a medical Listing.  Therefore, if Mr. Sheley's substance abuse impairment were not material, under the ALJ's own findings he could be found disabled at Step 3 in the sequential evaluation process." Pl.'s Br. at 15 (citations omitted).  The ALJ made clear, however, that the claimant's mental limitations could be found sufficiently severe at Step 3 "when not controlled by medication."  R. at 18.  The ALJ then proceeded to find that

> there may have been periods of time during which drug and/or alcohol use exacerbated the claimant's condition.  The claimant has testified that he no longer uses drugs or alcohol and the record would tend to support this conclusion. The undersigned, therefore, will not conclude that polysubstance abuse is not a material factor contributing to the determination of disability.

5

>With that said, when the claimant abstains from such drug or alcohol use and is compliant with medication, he functions well enough to perform work at the stated level.

R. at 18.  Mr. Sheley argues that the ambiguity in the ALJ's finding that he "will not conclude that polysubstance abuse is not a material factor contributing to the determination of disability" prevents adequate appellate review.  The Court disagrees.  In the context of the surrounding text and the rest of the ALJ's opinion, it is clear that the second "not" was included in error.  *Cf. Poppa v. Astrue*, 569 F.3d 1167, 1172 n.5 (10th Cir. 2009) ("The ALJ incorrectly stated that the surgeries took place in 'early 2004,' but we agree with the Commissioner that this was a mere scrivener's error and did not affect the outcome of the case.  The ALJ had noted the correct date of the surgeries earlier in his decision."); *Ramsey v. Barnhart*, 117 F. App'x 638, 641 (10th Cir. 2004) (unpublished) ("It is obvious from the text of this rule and from the ALJ's decision as a whole that the omission of the word 'not' in the ALJ's finding represents a typographical error, rather than a fatal ambiguity in the decision.").  The ALJ clearly concluded that Mr. Sheley's impairments were no longer materially affected by drug and alcohol use and, when controlled by medication, were not so severe as to prevent him from working.

Mr. Sheley argues that, in any event, and "contrary to the ALJ's finding, the evidence did not show that when abstinent, [he] functioned well enough to perform full time work of any kind."  Pl.'s Br. at 19.  A review of the record indicates that, in January 2006, the time of the alleged onset of his disability, Mr. Sheley's parents brought him to the emergency room at St. Mary's Hospital in Grand Junction, Colorado.  R. at 238; *cf.* R. at 393.  The emergency report indicates that he "has a longstanding history of

bipolar disorder." R. at 238. Mr. Sheley had gone off his medications and reported that he was "beset upon by 'demons'" and "continues to have auditory hallucinations that are demonic in nature." R. at 238.[3] On January 14, 2006, Dr. Mark Ramsey of the West Slope Mental Health Stabilization Center ("West Slope Mental Health") evaluated Mr. Sheley. R. at 266-267. He gave Mr. Sheley a Global Assessment of Functioning ("GAF")[4] of 35 on admission and a GAF of 45 as the highest in the past year. R. at 267. Two days later, another treating source at West Slope Mental Health noted that Mr. Sheley was "delusional with paranoid thoughts, laced with thoughts of Satanism" and reported "periodic auditory and visual hallucinations." R. at 268 (recording a current GAF of 30). Upon discharge, on January 23, 2006, his GAF had been raised to 45.[5] R. at 290.

When assessing the nature and severity of Mr. Sheley's mental impairment, the ALJ relied upon the opinions of Mr. Sheley's treating sources regarding his condition after the January 23, 2006 discharge. For example, the ALJ cited, among other things,

---

[3] Mr. Sheley was hospitalized in 2002 as well. *See* R. at 242-61.

[4] A GAF "is for reporting the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) ("DSM-IV") at 32. GAF is measured on a 100 point scale, with lower scores reflecting increasing problems with functioning.

[5] The DSM-IV describes a GAF between 31 and 40 as "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)," and a GAF between 41 and 50 as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (emphasis omitted).

the notation by Mr. Sheley's treating psychiatrist, Dr. Charles Lear, that Mr. Sheley "appeared to be compensated on current medication."  R. at 17; *see id.* ("Another report from the same month stated that the claimant was 'feeling pretty good about life right now.'  He was noted to be engaging in 'usual guy activities' such as playing video games and going to movies.").  The ALJ also relied upon the records of Mr. Sheley's therapist, a clinical social worker named Mike Lefebre.  For example, Mr. Lefebre indicated in August 2006 that Mr. Sheley was "very much stable and has really made a lot of improvement since the first time we saw him here."  R. at 16, 217.

The notations by Dr. Lear and Mr. Lefebre in the medical records are consistent with the ALJ's description.  For example, in April 2006, Dr. Lear recorded that Mr. Sheley reported "doing well" and that he "occasionally experiences hallucinatory phenomena but not often and when he does he recognizes the unreality of it."  R. at 262.  In July 2006, Dr. Lear noted that Mr. Sheley reported "a good three months," with "[n]o symptoms of psychosis or depression."  R. at 213 ("He is working productively.  No problem with medication reported.").  His therapist noted in December 2006 that Mr. Sheley's medications were working and that, while he still suffers from occasional hallucinations, they "seem to be pretty well under control."  R. at 182 ("He knows that he can call if he has any questions or problems, but otherwise he is very stable and doing a good job.").

In February 2007, Mr. Sheley began again to have "some disturbing visual hallucinations."  R. at 222.  As a result, Dr. Lear adjusted his medications.  R. at 222.  By May 2007, his therapist at the Marillac Clinic noted that Mr. Sheley "knows that if anything were to come up he could call and get in pretty quickly, but at this point his life

is pretty good." R. at 172; *see* R. at 173 (noting that, during that same month, Mr. Sheley reported that "things are going well" and that the medications were helping). Treatment notes on July 30, 2007 indicate that Mr. Sheley had gotten his auditory hallucinations under control. R. at 161 ("I think we have him at a pretty good place as far as the medication. The auditory hallucinations he experiences are very minimal right now."). Mr. Sheley reported to his therapist at the Marillac Clinic "that things have been going pretty well for him" on October 8, 2007. R. at 169. Four days later, Mr. Sheley reported to his psychiatrist, Dr. Charles E. Lear, that he was "doing well." R. at 167.

There is evidence that potentially calls into question the context in which these opinions were rendered. Dr. Lear's medical reports throughout this time period consistently indicate a GAF score of 35. *See, e.g.*, R. at 163-67, 201, 213, 371-74. The GAF "is a subjective determination based on a scale of 1-100 of 'the clinician's judgment of the individual's overall level of functioning.'" *Salazar v. Barnhart*, 468 F.3d 615, 624 n.4 (10th Cir. 2006) (quoting American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV") at 32). "A GAF of 31 to 40 is extremely low, and 'indicates [s]ome impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* At first glance, this GAF might seem to conflict with reports that Mr. Sheley was doing well and stabilizing. It may, however, indicate that Dr. Lear's and Mr. Lefebre's comments were made in the context of their belief that Mr. Sheley had very limited potential functionality. *See, e.g.*, R. at 176 (where Mr. Lefebre notes in February 2007 that Mr. Sheley "is not sure and [Mr. Lefebre

9

is] not sure whether [Mr. Sheley] will ever be able to work 40 hours per week, but there will be things he can do"); R. at 169 (where Mr. Lefebre notes in October 2007 that plaintiff "is still having periods where the auditory hallucinations disable him a little bit").

The ALJ was permitted to resolve conflicts in the medical evidence and was under no obligation to discuss every piece of evidence in the record, see Wall v. Astrue, 561 F.3d 1048, 1066 (10th Cir 2009), but he was required to "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." Haga v. Astrue, 482 F.3d 1205, 1207 (10th Cir. 2007). The GAF score of 35 appears throughout the relevant time period on the records of Mr. Sheley's treating psychiatrist, upon whom the ALJ relied. The ALJ, however, never references it. See Givens v. Astrue, 251 F. App'x 561, 567 (10th Cir. 2007) (unpublished) (concluding that it was error for the ALJ not to provide a reason for rejecting a treating physician's assignment of a GAF score of 50). The record and the ALJ's decision are insufficiently clear about whether the GAF score remained in the records as a vestige, never being revisited by Dr. Lear, or reflected the doctor's ongoing assessment of Mr. Sheley's condition. Therefore, on remand, the ALJ shall ensure the record is sufficiently complete to assess the impact, if any, of the GAF score on the determination of whether Mr. Sheley is disabled. Cf. Webster v. Astrue, No. 09-4005-JAR, 2009 WL 5215329, at *7 (D. Kan. Dec. 23, 2009) ("Here, the ALJ abstracted portions of Dr. Berg's report which are favorable to his decision, but ignored Dr. Berg's opinion and his GAF score which are supportive of plaintiff's allegations.").

The Court recognizes that "[w]hile GAF scores have been frequently used in Social Security disability benefits determinations, courts have often given them limited

weight." *Carlton ex rel. F.S.M. v. Astrue*, No. 8:08-cv-62-T-JRK, 2009 WL 890272, at *17 (M.D. Fla. March 31, 2009).  The consistent presence of the low score on Dr. Lear's reports raises a significant question regarding the context in which Dr. Lear made his statements regarding Mr. Sheley's condition.  *See Stewart v. Astrue*, No. ED CV 07-1070-PLA, 2008 WL 4829926, at *4 n.4 (C.D. Cal. Nov. 4, 2008) ("While a GAF score may not have a 'direct correlation' to the Social Security severity requirements, the ALJ does not proffer any authority indicating that the implications of plaintiff's GAF scores may be ignored without sufficient reason.") (citation omitted).  If Dr. Lear continued to assess Mr. Sheley as having a GAF of 35, that may reflect an opinion that Mr. Sheley had stabilized at a low level of functionality.  In that light, the ALJ shall address the issue and ensure the record is complete on remand.  *See Montoya v. Astrue*, No. 08-cv-00257-WYD, 2009 WL 724057, at *4 n.3 (D. Colo. March 19, 2009) ("The ALJ cannot simply ignore the GAF evidence.  'Standing alone, a low GAF score does not necessarily indicate an impairment seriously interfering with a claimant's ability to work.'  'A GAF score of fifty or less, however, does suggest an inability to keep a job.' . . . . The Tenth Circuit noted, 'If the ALJ believes that the medical record regarding Mrs. Thomas's mental impairments is insufficient and needs to be further developed, the ALJ must do so.'") (citing *Simien v. Astrue*, No. 06-5153, 2007 WL 1847205, at *2 (10th Cir. June 28, 2007), and quoting *Thomas v. Barnhart*, No. 04-7141, 2005 WL 2114163, at *3-4 (10th Cir. Sep. 2, 2005); *Lee v. Barnhart*, No. 03-7025, 2004 WL 2810224, at *3 (10th Cir. Dec. 8, 2004)); *see also Blake v. Astrue*, No. 07-1207-MLB, 2008 WL 2224847, at *6 (D. Kan. May 27, 2008) (concluding that while "a low GAF score does

not necessarily evidence an impairment seriously interfering with a claimant's ability to work . . . .[,] [a] GAF score of fifty or less . . . does suggest an inability to keep a job" and therefore "should not be ignored").

Addressing the impact of the GAF score may require revisiting not only the assessment of Mr. Sheley's credibility, but also revisiting the state agency opinion. Dr. Donald G. Glasco reviewed Mr. Sheley's medical records and concluded that he had a number of moderate limitations. R. at 306-308. He found, however, that if Mr. Sheley "will abstain from substance abuse, cooperate and comply with psychiatric treatment, his bipolar disorder should be controlled and he should be able to at least perform work of limited complexity, but work which requires accuracy and attention to detail." R. at 308.[6] Dr. Glasco found, however, that Mr. Sheley had "marked" limitations – which is a "[d]egree of limitation that satisfies the functional criterion" – in his ability to maintain concentration, persistence or pace, R. at 320, a conclusion the ALJ rejected. R. at 18. The ALJ's rejection of Dr. Glasco's opinion that Mr. Sheley had at least one "marked" limitation may require reconsideration depending on the ALJ's ultimate assessment of the GAF score's impact.[7]

---

[6]While Dr. Glasco incorrectly referenced bipolar disorder instead of schizophrenia, R. at 308; *see also* R. at 313, he references both schizophrenia and bipolar disorder elsewhere. R. at 322.

[7]Of course, supplementing the record in order to adequately address the GAF score may alter the ALJ's conclusion regarding Mr. Sheley's residual functional capacity when combining his mental and physical limitations, including his osteopenia of the left hip. While claimant also challenges the ALJ's conclusion that his spine disease was not severe at the second step of the analysis, the Court finds that the ALJ's conclusion is supported by substantial evidence and did not otherwise appear to be material to the ALJ's ultimate determination in light of his consideration of the record evidence regarding Mr. Sheley's physical limitations. *See* 20 C.F.R. § 404.1520(c) (defining a

**III. CONCLUSION**

For the reasons stated above, the Court finds that the Commissioner's finding that plaintiff is not disabled under the Act is not based on substantial evidence and, therefore, is REVERSED.  This case is REMANDED to the Commissioner for additional proceedings in accordance with this Order.

DATED February 10, 2010.

BY THE COURT:


s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

severe impairment as one "which significantly limits your physical or mental ability to do basic work activities").  Again, however, if the record is supplemented as part of the proceedings on remand, the ALJ will have the opportunity to reconsider whether Mr. Sheley's physical limitations, in combination with his mental limitations, render him disabled under the Act.